USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 30, 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                                      :
JOSE RIVERA,                                          :
                                                      :
                                  Plaintiff,          :        14 Civ. 6567 (KPF)
                                                      :
                     v.                               :        OPINION AND ORDER
                                                      :
COMMISSIONER OF SOCIAL SECURITY,                      :
                                                      :
                                  Defendant.          :
                                                      :
------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

Plaintiff Jose Rivera, proceeding *pro se*, filed this action pursuant to
Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), 42 U.S.C.
§§ 405(g), 1383(c)(3), seeking review of the final decision of the Acting
Commissioner of Social Security (the "Commissioner") denying his application
for Supplemental Security Income ("SSI") benefits based on a finding that
Plaintiff did not meet the Act's criteria for disability. Defendant has moved,
unopposed, for judgment on the pleadings, requesting that the Commissioner's
decision be upheld. As detailed in the remainder of this Opinion, because the
Administrative Law Judge (the "ALJ") failed to develop one aspect of the record
sufficiently, the Court is constrained to remand the matter for further
proceedings.

## BACKGROUND[1]

### A.    Plaintiff's Impairments

Plaintiff, who was born in 1976, applied for SSI benefits in June 2013, claiming disability as of January 1, 2013. (SSA Rec. 178). Plaintiff's claim for disability is based on a variety of maladies, including right-eye blindness, high blood pressure, heart problems, and diabetes. (*Id.* at 27, 208). At various points in the application process, Plaintiff also asserted that he suffered from a broken hand, depression, anxiety, and back pain, although these ailments were not specifically identified on the relevant forms as sources of Plaintiff's disability. (*Compare id.* at 53, 61, 205, 216, 223-24, *with id.* at 208).

In a Function Report submitted to the Social Security Administration (the "SSA"), Plaintiff contended that his ailments permeated nearly every aspect of his life by limiting his physical movements, mental acuity, and activities of daily living. Specifically, Plaintiff claimed that he could no longer lift more than five pounds, stand for more than five minutes, walk "for long periods of time," sit "for long periods of time," climb more than one flight of stairs, kneel for more than one minute, squat for more than five seconds, reach, or use his hands to grab items. (SSA Rec. 220-21). Plaintiff also attributed his diminished energy, difficulty maintaining balance, and gait abnormality to his ailments. (*Id.* at 219). The Function Report further recounts spells of "forgetful[ness]" as well as "disorient[ation]," which Plaintiff tied to imbalances

---

[1]    The facts in this Opinion are drawn from the Social Security Administrative Record ("SSA Rec.") (Dkt. #11) filed by the Commissioner.

in his "sugars," presumably a reference to Plaintiff's diabetes. (*Id.*).  Finally, "back pain" and "body pain," although untethered to any reported medical condition, reportedly keep Plaintiff "up all night." (*Id.* at 216).

Aside from documenting their physical manifestations, the Function Report also catalogued the many ways in which Plaintiff's ailments adversely impacted his daily life, culminating in Plaintiff's assertion that he only left home to attend medical appointments. (SSA Rec. 218, 220).  Plaintiff also related that he could no longer independently prepare his own meals, clean, do the laundry, partake in household chores, or shop. (*Id.* at 217-19).  According to Plaintiff, his limitations even adversely impacted his ability to perform basic personal care tasks, such as bathing. (*Id.* at 216).

In the testimony he provided to an ALJ at a hearing held on January 24, 2014 (the "SSA Hearing"), Plaintiff elaborated on his conditions and their impact on his life.  Specifically, Plaintiff explained that he had lost function in his right eye and could no longer walk more than two blocks without "los[ing] the air" or experiencing "shaking" in his knees. (SSA Rec. 54, 58).  In addition, Plaintiff described walking with the aid of a cane to maintain his balance. (*Id.* at 58).  Apart from his sight and mobility issues, Plaintiff testified that he tired after standing for "periods of time." (*Id.*).  Finally, Plaintiff relayed that he was "very depressed," spent his days in bed, and did not "go out." (*Id.* at 60-61).

**B.    Plaintiff's Work History**

Plaintiff, a native Spanish speaker, did not complete his high school education. (SSA Rec. 61, 207).  His erratic employment history includes short

stints in warehouse work, landscaping, laying pavement, preparing food as

both a short-order and pre-cook, and babysitting.  (*Id.* at 65, 209, 226-27).

Although there is some ambiguity in the record, it appears that Plaintiff was

most recently employed as a cook and landscaper, work he can no longer

perform because of his disability.  (*Id.* at 65, 209).

**C.    Plaintiff's Medical and Psychological Evaluations**

   **1.    Navid Hakimian, M.D.**

   In September 2006, Plaintiff was treated at Lincoln Medical and Mental

Health Center ("Lincoln Medical") by Dr. Navid Hakimian for "chronic retinal

detachment" and a cataract in his right eye.  (SSA Rec. 297, 321, 398).  The

precise cause of the retinal detachment is ambiguous and might be due to

glaucoma or blunt force trauma.  (*See id.* at 384, 394).  Despite undergoing a

surgical procedure to reattach his retina and remove the cataract, Plaintiff still

suffers from blindness in his right eye.  (*Id.* at 321, 384, 394).

   **2.    Verghese George, M.D.**

   In September 2010, Plaintiff sought treatment at Lincoln Medical for an

injury to his right hand sustained while punching another individual.  (SSA

Rec. 301, 309).  Dr. Verghese George, the treating physician, observed during

his examination that Plaintiff "was unable to make a full fist."  (*Id.* at 309).

Unsurprisingly, Plaintiff was ultimately diagnosed with a "comminuted fracture

of the fifth metacarpal bone" (i.e., a break of the bone into several pieces),

which Dr. George recommended treating with a cast.  (*Id.* at 301, 309).

In April 2011, Plaintiff reinjured his right hand after falling, and once again was treated by Dr. George at Lincoln Medical.  (SSA Rec. 306-07).  The contemporaneous medical records reveal that Plaintiff suffered a "comminuted displaced and mildly angulated fracture of the distal fifth metacarpal."  (*Id.* at 302).  In other words, Plaintiff suffered a "refracture through an old fracture" in his right hand that Dr. George recommended treating with a splint or cast.  (*Id.* at 306).

### 3.   Bronx-Lebanon Hospital

From June 7 through 19, 2013, Plaintiff was hospitalized at Bronx-Lebanon Hospital ("Bronx-Lebanon"), where he received treatment for a heart attack, coronary artery disease, pneumonia, fever, delirium tremens, diabetic ketoacidosis, uncontrolled diabetes, severe systolic heart failure, hypertension, and hyperlipidemia.  (SSA Rec. 328).  Plaintiff was initially admitted to the hospital after presenting with chest pains, pain in his upper abdomen, and episodes of vomiting.  (*Id.* at 332).  Doctors determined that Plaintiff was in the throes of a heart attack, and, as a consequence, he was taken to the cardiac catheterization lab where stents were implanted in his heart.  (*Id.*).  The day after this procedure, an echocardiogram of Plaintiff's heart revealed: (i) an ejection fraction of 27.07%; (ii) hypokinesis (i.e., abnormally decreased motion) of the mid lateral, mid anterior, and base anterior segments; (iii) akinesis (i.e., lack of motion) of the mid anteroseptal, apex inferior, apex lateral, and apex anterior segments; and (iv) the formation of a blood clot.  (*Id.* at 333).  As a

consequence of these findings, protocols were initiated to treat Plaintiff for congestive heart failure and blood clots.  (*Id.* at 333, 335).

During his treatment in the catheterization lab, Plaintiff's condition deteriorated, requiring intubation.  (SSA Rec. 332).  After Plaintiff was extubated, his conduct was described as "very agitated and aggressive," which the doctors attributed to "delirium secondary to drug use" and/or delirium tremens.  (*Id.* at 328, 333, 335).  Corroborating these observations, Plaintiff's toxicology test revealed the presence of cocaine, benzodiazepine, and alcohol. (*Id.* at 333).  The presence of narcotics and alcohol comported with Plaintiff's "history of extremely heavy abuse of drugs [and] alcohol[.]"  (*Id.* at 329).

During his hospitalization at Bronx-Lebanon, doctors also diagnosed Plaintiff with diabetic ketoacidosis, a potentially fatal complication associated with diabetes.  (SSA Rec. 332).  However, the records indicate that this condition was successfully treated prior to Plaintiff's discharge.  (*Id.* at 335).  In the same vein, by the date of his discharge, Plaintiff had "significantly improv[ed]" and "appear[ed] to be much more oriented and walking around without any problems."  (*Id.* at 329).

### 4.    Realino N. Santos, M.D.

On July 7, 2013, weeks after his hospitalization at Bronx-Lebanon, Plaintiff was treated by Dr. Realino N. Santos for a rash on his arm.  (SSA Rec. 317).  During the intake process, Plaintiff did not report any pain and was described by the attending nurse as "independent with activities of daily living." (*Id.* at 303).  In his examination notes, Dr. Santos reported "normal findings"

6

with respect to Plaintiff's chest as well as "heart sounds," and did not record

any neurological complaints.  (*Id.* at 318).

###### 5.     The FEGS Evaluations

On July 16, 2013, a social worker interviewed Plaintiff as part of the

Federation Employment and Guidance Service ("FEGS") Wellness

Comprehensive Assessment, Rehabilitation and Employment Program funded

by the New York City Human Resources Administration.  (SSA Rec. 350).  At

the outset, Plaintiff related that he travelled to the appointment with the

assistance of his girlfriend because of his inability to utilize public

transportation independently after his heart attack.  (*Id.* at 352-53).  In the

interview, Plaintiff recounted suffering from diabetes, hypertension, high

cholesterol, complete blindness in his right eye, a broken bone in his right

hand, back pain, and a heart attack.  (*Id.* at 354).  Separate and apart from

these conditions, Plaintiff further reported suffering from depression.  (*Id.* at

355).  These ailments purportedly hampered Plaintiff's ability to walk, climb

stairs, bathe, dress, groom, toilet, prepare meals, and perform basic household

chores.  (*Id.* at 358).  In addition to the limitations on his daily activities,

Plaintiff further claimed that his conditions prevented him from obtaining

employment.  (*Id.* at 354).

Aside from meeting with a social worker, Plaintiff underwent a physical

examination performed by Dr. Jee Lee.  During the examination, Dr. Lee did

not record any signs of fatigue, chest pain, hypertension, shortness of breath,

or heart palpitations.  (SSA Rec. 365, 366-67, 371).  On the other hand, Dr. Lee

7

noted that Plaintiff experienced pain in his right hand, moderate back pain, gait problems, issues maintaining balance, and total blindness in his right eye. (*Id.* at 368, 370, 372-73).  The record is unclear whether Plaintiff experienced any weakness during his examination.  (*Compare id.* at 365, 368, *with id.* at 372).  After the examination, Dr. Lee diagnosed Plaintiff with a joint disorder, a heart condition, depression, and an abnormal gait.  (*Id.* at 376-77).  Dr. Lee concluded that Plaintiff was "potentially unable to work" based on his coronary artery disease and difficulties balancing, but that the joint pain and depression did not present impediments to employment.  (*Id.*).

### 6.   Consultative Examinations

#### a.   Lucy Kim, Psy. D.

Clinical psychologist Lucy Kim performed a consultative psychiatric examination of Plaintiff on August 24, 2013.  (SSA Rec. 379).  At the outset, Dr. Kim noted that Plaintiff travelled 45 minutes by bus to attend their session, was dressed appropriately, and was well-groomed.  (*Id.* at 379-80).  During their session, Plaintiff reported difficulties falling asleep, an increase in appetite unaccompanied by weight gain, psychomotor agitation, diminished self-esteem, social withdrawal, irritability, excessive worry, and fatigue, all arising after his Bronx-Lebanon hospitalization.  (*Id.* at 379).  Although Plaintiff's affect was dysphoric (i.e., unhappy or ill at ease) and his mood dysthymic (i.e., depressed), Dr. Kim concluded that his manner of relating, social skills, and overall presentation were "adequate."  (*Id.* at 380).  And while Plaintiff's speech was slurred, both his expressive and receptive language were similarly deemed

8

"adequate." (*Id.*).  According to Dr. Kim, Plaintiff's thought process was coherent and goal-directed with no evidence of hallucinations, delusions, or paranoia.  (*Id.*).  Despite his "mildly impaired" memory, attention, and concentration, the doctor characterized Plaintiff's intellectual functioning as average.  (*Id.* at 381).  In terms of Plaintiff's mode of living, Dr. Kim assessed that Plaintiff could independently dress, bathe, groom, cook, clean, and do laundry.  (*Id.*).  In sum, Dr. Kim concluded that Plaintiff could understand and follow directions, perform simple tasks independently, maintain a regular schedule, learn new tasks, perform complex tasks, make appropriate decisions, relate adequately with others, and appropriately manage stress.  (*Id.*).  As a corollary, Dr. Kim found that Plaintiff's psychiatric problems did "not appear to be significant enough to interfere with [his] ability to function on a daily basis." (*Id.*).

### b.   Sharon Revan, M.D.

On August 24, 2013, Dr. Sharon Revan, an internist at Industrial Medicine Associates, P.C., performed a consultative medical examination of Plaintiff.  (SSA Rec. 384).  Plaintiff's chief complaints, as related by Dr. Revan, pertained to his diabetes, hypertension, and high cholesterol.  (*Id.*).  Plaintiff further described numbness as well as tingling in his extremities; knee pain when lying down, sitting, and standing; and fatigue after climbing a flight of stairs.  (*Id.*).  However, during the examination, Plaintiff denied any heart problems, including chest pain, palpitations, shortness of breath, or lower extremity edema, even as he noted that he had suffered a heart attack, had

stents implanted in his heart, and was previously informed that his heart was performing at 20% of its normal capacity. (*Id*.).

As an initial matter, despite these medical complaints, Dr. Revan observed that Plaintiff did not appear to be in "acute distress." (SSA Rec. 385). Her examination revealed that although Plaintiff limped when walking on his heels, he did not require an assistive device and his gait, along with his stance, were otherwise normal. (*Id*.). Dr. Revan also found that Plaintiff's ranges of motion in his shoulders, back, elbows, forearms, wrists, hips, knees, and ankles were normal. (*Id*. at 386). According to Dr. Revan, Plaintiff's strength in his upper extremities, lower extremities, and grip was five out of five. (*Id*. at 386-87). In accord with these assessments, Plaintiff did not require any assistance changing for the exam, mounting or dismounting the exam table, or rising from a chair. (*Id*. at 385). Similarly, Dr. Revan's notes indicated that Plaintiff independently showered, dressed, cooked, cleaned, did laundry, and shopped. (*Id*.).

Ultimately, Dr. Revan diagnosed Plaintiff with diabetes, hypertension, and high cholesterol. (SSA Rec. 387). In her medical source statement, Dr. Revan concluded that Plaintiff: (i) suffered a marked limitation in his vision due to blindness in the right eye; (ii) experienced moderate limitations sitting, standing, walking, and lying down because of knee pain; and (iii) faced only a mild limitation climbing stairs as the result of fatigue. (*Id*.) In Dr. Revan's estimation, Plaintiff experienced no limitations with respect to his speech, hearing, personal grooming, and "activities of daily living." (*Id*.).

### c.    Gene Matusow, M.D.

On January 9, 2014, Dr. Gene Matusow performed a consultative eye examination on Plaintiff.  (SSA Rec. 394).  Based on his examination, Dr. Matusow diagnosed Plaintiff with blindness in his right eye and 20/60 vision in his left eye, the latter of which could be improved to 20/20 with correction. (*Id.*).  Nevertheless, Dr. Matusow concluded that Plaintiff suffered from a permanent visual disability as a result of right-eye blindness.  (*Id.* at 395).

### 7.    Dr. Fjona Fundo

On January 23, 2014, Plaintiff's primary care physician, Dr. Fjona Fundo, completed questionnaires relating to Plaintiff's diabetes and heart failure.  (SSA Rec. 401-05).  According to these documents, Plaintiff suffered from Type II diabetes and congestive heart failure.  (*Id.* at 401).  However, with respect to the diabetes, Dr. Fundo noted that Plaintiff's condition was "very well controlled."  (*Id.*).  As to the congestive heart failure, Dr. Fundo explained that Plaintiff's ejection fraction had improved from 27% in June 2013 to 57% in December 2013.  (*Id.*).  In addition, Dr. Fundo did not select any symptoms or complications listed on the "heart failure" questionnaire that she completed concerning Plaintiff.  (*Id.* at 403).  Ultimately, Dr. Fundo concluded that Plaintiff could work four to six hours per day, stand for two hours at a time, sit for two hours at a time, occasionally lift ten pounds, and frequently lift five pounds.  (*Id.* at 401, 404).

## D.     The Social Security Administrative Proceeding

By letter dated September 20, 2013, Plaintiff was informed that his application for SSI benefits had been denied because a review of his health problems demonstrated that he was not disabled or blind under the applicable rules.  (SSA Rec. 85).  In the denial letter, Plaintiff was notified of his right to request a hearing to challenge the adverse decision.  (*Id.* at 86).  At Plaintiff's election, a hearing was held before ALJ Dennis O'Leary on January 24, 2014, at which Plaintiff and his counsel were present by videoconference.  (*Id.* at. 48-73).[2]  On February 24, 2014, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act (the "February 24 Decision").  (*Id.* at 23-33).

In the February 24 Decision, the ALJ followed the prescribed five-step inquiry for evaluating disability claims.  (SSA Rec. 24-25 (citing 20 C.F.R. § 416.920(a))).[3]  As a threshold matter, the ALJ determined that Plaintiff

---

[2]     The Court notes that although Plaintiff was represented by counsel at the SSA Hearing, he commenced the instant litigation *pro se.*

[3]     The Second Circuit has described the five-step analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

satisfied the first two steps of the analysis: (i) he had not engaged in substantial activity since the onset date of his alleged disability; and (ii) he had three severe impairments — coronary artery disease, status post-myocardial infarction, and an adjustment disorder with mixed anxiety and depression. (*Id.* at 25).

At the third step of the inquiry, the ALJ found that Plaintiff lacked an impairment or combination of impairments that met or medically equaled the severity of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix I, the presence of which would have allowed him presumptively to qualify as disabled. (SSA Rec. 25). In reaching this conclusion, the ALJ found that Plaintiff did not satisfy the listings for section 2.02 (loss of central visual acuity), section 4.02 (chronic heart failure), section 4.04 (ischemic heart disease), and section 12.04 (affective disorders). (*Id.* at 25-26). Specifically, the ALJ held that Plaintiff's right-eye blindness did not meet the listing requirements for section 2.02, given the absence of evidence that "the remaining vision in the better eye after correction [was] 20/200 or less." (*Id.* at 26). As to section 4.02, the ALJ concluded that Plaintiff failed to satisfy the requirements of this listing because his heart's ejection fraction had improved from 27% to 57%. (*Id.*). In a more summary fashion, the ALJ held that Plaintiff's "coronary artery disease and status post myocardial infarction [did]

---

*Selian* v. *Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

not meet the requirements of 4.04 because the requirements of subsections A, B or C [had] not been completely satisfied." (*Id.* at 25).

As to Plaintiff's alleged mental disabilities, the ALJ undertook a detailed analysis of section 12.04, primarily focusing on whether the "paragraph B" criteria for the listing were satisfied. (SSA Rec. 26). The ALJ explained that in order to satisfy "paragraph B," a mental impairment must result in at least two of the following: (i) marked restriction of activities of daily living; (ii) marked difficulties in maintaining social functioning; (iii) marked difficulties in maintaining concentration, persistence, or pace; or (iv) repeated episodes of decompensation, each of extended duration. (*Id.*). The ALJ noted that a "marked limitation means more than moderate but less than extreme," and that "[r]epeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." (*Id.*). Applying these criteria to Plaintiff, the ALJ determined that Plaintiff only experienced a mild limitation in his activities of daily living and social functioning. (*Id.*). The ALJ next found that Plaintiff faced a moderate limitation with respect to maintaining concentration, persistence, and pace. (*Id.*). Finally, the ALJ concluded that Plaintiff did not experience any episodes of decompensation of an extended duration. (*Id.* at 27). Accordingly, Plaintiff's condition did not warrant a presumption of disability based on mental impairment. (*Id.*).

The ALJ then proceeded to step four of the disability analysis, which, as a threshold matter, required him to determine the highest level of work that

14

Plaintiff could perform given his impairments — his residual functional capacity ("RFC").  20 C.F.R. § 416.945.  Here, the ALJ determined that Plaintiff retained the RFC to perform sedentary work so long as the work did not require "depth perception" or anything "greater than simple repetitive tasks."  (SSA Rec. 27).  In reaching this determination, the ALJ considered: (i) "all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence"; and (ii) "opinion evidence."  (*Id.*).

Turning to the first category, in considering Plaintiff's symptoms, the ALJ employed a two-step process.  First, he determined whether there was an underlying impairment "that could reasonably be expected to produce the [Plaintiff's] pain or other symptoms."  (SSA Rec. 27).  Second, the ALJ evaluated the "intensity, persistence, and limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit[ed] [his] functioning."  (*Id.*).  In this regard, the ALJ observed that "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, [an ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record."  (*Id.*).

Applying this two-step process, the ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning their intensity, persistence, and limiting effects were not entirely credible.  (SSA Rec. 29).  As to Plaintiff's heart

ailments, the ALJ noted that Plaintiff was hospitalized and treated for a heart attack, multi-vessel coronary disease, and an ejection fraction of 27%. (*Id.* at 29-30). Notwithstanding this history of heart disease, the ALJ concluded that Plaintiff's claims that he suffered from disabling shortness of breath and fatigue were not borne out by the record. Specifically, the severity of these symptoms was belied by the fact that Plaintiff denied any chest pain, palpitations, shortness of breath, or asthma during his consultative examination with Dr. Revan. (*Id.* at 29). In the ALJ's estimation, Plaintiff's improved ejection fraction and quarterly visits to his cardiologist further undermined the severity of any symptoms related to his heart ailments. (*Id.* at 30).

As to the right-eye blindness, the ALJ held that "the evidence indicates that [Plaintiff's] activities of daily living [were] not affected by his visual impairment." (SSA Rec. 30). In reaching this conclusion, the ALJ first observed that with correction Plaintiff's vision in his left eye was 20/20. (*Id.*). As a consequence, Plaintiff still independently managed to maintain his personal care, cook, clean, do laundry, shop, use transportation, attend doctor's appointments, watch television, and read. (*Id.*).

Turning to Plaintiff's diabetes, the ALJ held that this condition was well controlled with medication and there was no evidence of end organ damage. (SSA Rec. 30). As to Plaintiff's reports of constant numbness and tingling in his hands and feet, the ALJ found that these assertions were unsupported by the evidence, as the consultative examination by Dr. Revan failed to uncover

neurological, motor, or sensory deficits. (*Id.*). Moreover, Dr. Fundo's medical course statement did not indicate that Plaintiff suffered from neuropathy or any other residual complications from diabetes. (*Id.*).

The ALJ next discounted the intensity of the pain Plaintiff attributed to his injured right hand. (SSA Rec. 30). As an initial matter, the ALJ found that the severity of this pain was contradicted by the fact that Plaintiff engaged in substantial gainful activity for a number of years following the 2010 injury to his hand. (*Id.*). In addition, Dr. Revan's consultative examination revealed that Plaintiff enjoyed full range of motion in his bilateral upper extremities with no evidence of strength or sensory deficits, his hand and finger dexterity was intact, and his grip strength was five out of five. (*Id.*).

In assessing the severity of any pain to Plaintiff resulting from his several medical impairments, the ALJ held that Plaintiff's credibility was impugned by virtue of his inconsistent statements concerning the use of narcotics. (SSA Rec. 30). Specifically, the ALJ noted that Plaintiff denied abusing drugs other than marijuana during his consultative examinations with Dr. Kim and Dr. Revan. (*Id.*). However, during his hospitalization at Bronx-Lebanon, Plaintiff tested positive for cocaine and benzodiazepine. (*Id.*).

As to the opinion evidence in the record, the ALJ afforded "great weight" to the findings of Dr. Revan and Dr. Kim in fashioning Plaintiff's RFC. (SSA Rec. 31). On the other hand, the ALJ only subscribed "some weight" to Dr. Fundo's medical course statement, finding that there was no evidence in the record to support her assertion that Plaintiff was limited to sitting for two

17

hours.  (*Id.*).  However, the ALJ credited Dr. Fundo's opinion that Plaintiff could only stand for two hours and occasionally lift ten pounds.  (*Id.*).

After determining Plaintiff's RFC, the ALJ considered whether Plaintiff could perform his past relevant work.  (SSA Rec. 31).  Because Plaintiff's past employment as a short-order cook entailed "light work," the ALJ concluded that Plaintiff was unable to perform his past relevant work.  (*Id.*).

As required at step five of the disability analysis, the ALJ next assessed whether there was other work that Plaintiff could perform.  (SSA Rec. 32).  In considering this question, the ALJ, at the SSA Hearing, solicited testimony from a vocational expert ("VE") to determine whether jobs existed in the national economy for an individual with Plaintiff's age, education, work experience, and RFC.  (*Id.; see also id.* at 65-70).  In his opinion, the ALJ noted that the VE testified that an individual with Plaintiff's specific qualifications and limitations would be able to perform the requirements of representative occupations such as: (i) ticket seller; (ii) telephone surveyor, of which there were 50,000 in the national economy, and 2,500 in the regional economy; and (iii) telephone marketer, of which there were 64,500 in the national economy, and 1,758 in the regional economy.  (*Id.* at 32).[4]  Based on the VE's testimony, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, and as a consequence Plaintiff was "not disabled" under the Act.  (*Id.*).

---

[4]     In calculating the number of job openings in the national and local economy, the VE accounted for Plaintiff's lack of proficiency in the English language.  (SSA Rec. 32).

18

**E.   The Instant Litigation**

Plaintiff filed his Complaint on August 15, 2014, seeking review of the February 24 Decision on the grounds that the ALJ's decision was erroneous, not supported by substantial evidence in the record, and/or contrary to law. (Dkt. #1).  Plaintiff amended his Complaint on September 3, 2014, attaching two reports from Bainbridge Avenue MRI to the pleading.  (Dkt. #3).  On September 16, 2014, the Court issued an Order setting a schedule for Defendant to file an Answer or otherwise move with respect to the Complaint. (Dkt. #6).  On December 22, 2014, the Court extended Defendant's time to respond to the Complaint to January 28, 2015.  (Dkt. #9).

On January 28, 2015, Defendant filed an Answer (Dkt. #10), and a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) (Dkt. #13).  Plaintiff was served with the notice of motion for judgment on the pleadings, the supporting memorandum, and copies of unreported decisions cited in the memorandum on January 28, 2015.  (Dkt. #15).  To date, Plaintiff has not filed an opposition to Defendant's motion.

## DISCUSSION

**A.   Applicable Law**

**1.   Motions under Federal Rule of Civil Procedure 12(c)**

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  In deciding a motion for judgment on the pleadings, courts apply the standard used to evaluate a

19

motion to dismiss under Rule 12(b)(6).  *Altman* v. *J.C. Christensen & Associates, Inc.*, 786 F.3d 191, 193 (2d Cir. 2015); *Johnson* v. *Rowley*, 569 F.3d 40, 43 (2d Cir. 2009).  Under this standard, courts must "accept as true the facts alleged in the complaint, consider those facts in the light most favorable to the plaintiff, and determine whether the complaint sets forth a plausible basis for relief."  *Galper* v. *JP Morgan Chase Bank, N.A.*, — F.3d —, No. 14-0867-cv, 2015 WL 5711882, at *3 (2d Cir. Sept. 30, 2015); *see generally Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-80 (2009); *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).

Significantly, "a failure to respond to a 12(c) motion cannot constitute a 'default' justifying dismissal of the complaint."  *Maggette* v. *Dalsheim*, 709 F.2d 800, 802 (2d Cir. 1983); *accord Goldberg* v. *Danaher*, 599 F.3d 181, 183 (2d Cir. 2010); *Orr* v. *Comm'r of Soc. Sec.*, No. 13 Civ. 3967 (AJN), 2014 WL 4291829, at *4 (S.D.N.Y. Aug. 26, 2014).  Rather, the Court must examine all the pleadings and decide as a matter of law whether Plaintiff has stated a plausible claim for relief.  *See Maggette*, 709 F.2d at 802; *Galper,* 2015 WL 5711882 at *3.  Furthermore, while "Plaintiff has not filed his own motion for judgment on the pleadings, his failure to do so does not prevent the Court from remanding this matter to the Commissioner if the record shows that remand is warranted."  *Orr*, 2014 WL 4291829, at *4.

20

Finally, when a plaintiff proceeds *pro se*, as Plaintiff does in this case, the Court is "obligated to construe [his] complaint liberally." *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

> **2.    Review of Determinations by the Commissioner of Social Security**

In order to qualify for benefits under the Act, a claimant must demonstrate that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see generally Lewis* v. *Colvin*, 548 F. App'x 675, 677 n.3 (2d Cir. 2013) (summary order). The claimant must also establish that the impairment is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). Further, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 1382c(a)(3)(D).

In reviewing the final decision of the SSA, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A court must uphold a final SSA determination to deny benefits unless that decision is unsupported by substantial evidence or is based on an incorrect

legal standard.  *Selian* v. *Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) ("In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." (quoting *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012))); *see also* 42 U.S.C. § 405(g).  Furthermore, where the findings of the SSA are supported by substantial evidence, those findings are "conclusive."  *Diaz* v. *Shalala*, 59 F.3d 307, 312 (2d Cir. 1995) ("The findings of the Secretary are conclusive unless they are not supported by substantial evidence." (citing 42 U.S.C. § 405(g))).

"'Substantial evidence' is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Talavera*, 697 F.3d at 151 (quoting *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971)).  The substantial evidence standard is "a very deferential standard of review — even more so than the clearly erroneous standard."  *Brault* v. *Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted).  To make the determination of whether the agency's finding were supported by substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Talavera*, 697 F.3d at 151 (quoting *Mongeur* v. *Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

### 3.    The ALJ's Duty to Develop the Record

Regardless of whether the claimant is counseled or *pro se*, the presiding ALJ has an affirmative obligation to develop the administrative record in light of the non-adversarial nature of the benefits proceeding.  *See Lamay* v. *Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009); *Shaw* v. *Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Casino-Ortiz* v. *Astrue*, No. 06 Civ. 155 (DAB) (JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing *Perez* v. *Chater*, 77 F.3d 41, 47 (2d Cir. 1996)).  To this end, the regulations require the Commissioner to develop a claimant's complete medical history before making a disability determination, and assure claimants that the Commissioner "will make every reasonable effort to help [them] get medical reports from [their] own medical sources[.]"  20 C.F.R. § 416.912(d); *see Ericksson* v. *Comm'r of Soc. Sec.*, 557 F.3d 79, 83 (2d Cir. 2009); *Perez*, 77 F.3d at 47.[5]  The regulations further provide that the Commissioner "will request a medical source statement about what [the claimant] can still do despite [their] impairments."  20 C.F.R. § 416.913(b)(6).

Taken together, the regulations impose a duty on the ALJ to "'make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of [] that treating

---

[5]    "Whether the ALJ has a duty to develop the record with respect to treating sources after the date of filing is not settled and may depend on the facts of the case." *Moreira* v. *Colvin*, No. 13 Civ. 4850 (JGK), 2014 WL 4634296, at *5 n.2 (S.D.N.Y. Sept. 15, 2014). However, courts have applied the duty to develop the record where, as here, the plaintiff files his application less than a month after undergoing surgery and is receiving continuing treatment. *See, e.g.*, *id.*

physician as to the existence, the nature, and the severity of the claimed disability.'" *Molina* v. *Barnhart*, No. 04 Civ. 3201 (GEL), 2005 WL 2035959, at *6 (S.D.N.Y. Aug. 17, 2005) (quoting *Peed* v. *Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991)).  That said, the Second Circuit has clarified that "remand is not always required when an ALJ fails in his duty to request opinions," particularly where "the record contains sufficient evidence from which an ALJ can assess [claimant's] residual functional capacity." *Tankisi* v. *Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order); *see also Swiantek* v. *Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (summary order). Similarly, courts in this District have found that "it is not *per se* error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician." *Sanchez* v. *Colvin*, No. 13 Civ. 6303 (PAE), 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015).

## B.   Analysis

Cognizant of this flexibility in considering the adequacy of the record, the Court finds that the ALJ here failed to develop one segment of the record and, upon reflection, believes that this failure requires remand for further proceedings.  The parties do not dispute that Plaintiff suffered a severe cardiac episode in June 2013 resulting in hospitalization, an ejection fraction of 27%, and the implantation of stents.  (SSA Rec. 332-33).  After this cardiac event, the record indicates that Plaintiff was referred to Dr. Khullar, a cardiologist, for continuing treatment.  (*Id.* at 263, 325).  In fact, at the SSA Hearing, Plaintiff specifically testified that he visited Dr. Khullar, whom he identified as his

cardiologist, every three months.  (*Id.* at 61).  Notwithstanding these references — and, more pointedly, the centrality of Plaintiff's heart ailment to the disability determination — the record lacks medical records or an RFC opinion from Dr. Khullar.

Preliminarily, it does not appear that the ALJ attempted to obtain a complete record of treatment or an opinion from Dr. Khullar.  While the record reveals that the ALJ requested medical records from Lincoln Medical, there is no indication that a similar request was propounded on Dr. Khullar.  (SSA Rec. 258).  And while the ALJ held the record open for two weeks, that was to allow Plaintiff's counsel to obtain "the records from Dr. Khullar regarding the ejection fraction" alone.  (*Id.* at 60).

The law is unsettled as to whether a request from an ALJ to counsel to obtain additional information satisfies the duty to develop the record.  *Compare Newsome* v. *Astrue*, 817 F. Supp. 2d 111, 137 (E.D.N.Y. 2011) ("The fact that the ALJ requested additional information from Plaintiff's attorney and did not receive that information does not relieve the ALJ of his duty to fully develop the record."), *with Rivera* v. *Comm'r of Soc. Sec.*, 728 F. Supp. 2d 297, 330 (S.D.N.Y. 2010) ("Accordingly, the ALJ's request that plaintiff's attorney obtain the recent treatment records from Lincoln Hospital fulfilled his obligations with regard to developing the record.").  The Court need not wade into these unsettled waters, however, because the ALJ's request to counsel in this case was inadequate.  In holding the record open, the ALJ only requested a discrete subset of medical records pertaining to Plaintiff's ejection fraction, rather than

a larger set of documents relating either to Dr. Khullar's treatment or to an RFC assessment.  (*Id.* at 23 ("I left the record open for 2 weeks to allow counsel to procure additional medical evidence, specifically an updated report showing the claimant's ejection fraction while not under the influence of substance abuse after June 8, 2013.")).  Accordingly, even if a request to counsel to obtain materials and an opinion from a treating physician could satisfy the ALJ's duty to develop the record, the request in this case was insufficient.

While recognizing that the standard of review here is one of substantial evidence, the Court concludes that the ALJ's failure to obtain medical records from Dr. Khullar requires a remand, given the significance of Plaintiff's heart ailments to the disability determination.  The February 24 Decision recognized that Plaintiff suffered from coronary artery disease, which the ALJ classified as a severe impairment at stage two of the disability analysis.  (SSA Rec. 25). Despite this designation, few medical records post-date Plaintiff's discharge from Bronx-Lebanon, and what little material was developed is contradictory. For example, Dr. Revan, the consultative examiner, reported that Plaintiff did not suffer from chest pain, palpitations, or shortness of breath.  (*Id.* at 384). However, FEGS examiner Dr. Lee reported that Plaintiff suffered from coronary artery disease (*id.* at 377), and Dr. Fundo concluded that Plaintiff suffered from congestive heart failure (*id.* at 403).  Separate and apart from clarifying these ambiguities, medical records from Dr. Khullar would also be probative of the issue of whether Plaintiff satisfies the criteria of section 4.04 of 20 C.F.R. Part

404, Subpart P, Appendix I.[6]  In sum, Dr. Khullar's records were clearly
relevant to the ALJ's evaluation of Plaintiff's claim of disability based on heart
ailments, and the failure to request these materials requires a remand.  *See
Rosa* v. *Callahan*, 168 F.3d 72, 80 (2d Cir. 1999) ("Aside from her failure to
seek additional information from Dr. Ergas, the ALJ also failed to obtain or
attempt to obtain the records of a number of other physicians identified by
[claimant][.]"); *Corporan* v. *Comm'r of Soc. Sec.*, No. 12 Civ. 6704 (JPO), 2015
WL 321832, at *28 (S.D.N.Y. Jan. 23, 2015) ("[T]he ALJ erred by not attempting
to procure current records from Metropolitan Hospital after [claimant] told him
during the hearing that she recently began treatment with one of the hospital's
psychiatrists."); *Dimitriadis* v. *Barnhart*, No. 02 Civ. 9203 (DC), 2004 WL
540493, at *11 (S.D.N.Y. Mar. 17, 2004) ("[T]he ALJ was required to obtain
medical records and an opinion from Dr. Valle.");  *Hughes* v. *Apfel*, 992 F.
Supp. 243, 247 (W.D.N.Y. 1997) ("ALJ Glazer had the affirmative duty to either
request that plaintiff submit her medical records, or attempt to obtain them
himself. There is no indication that he did either, although plaintiff clearly
identified Dr. Rim as her primary physician on more than one occasion.").

As explained above, the failure to request an RFC opinion from a treating
physician does not require a remand *per se*; on the facts of this case, however,
the Court concludes that a remand is necessary.  *See Tankisi*, 521 F. App'x at
34; *Sanchez*, 2015 WL 736102, at *5.  As discussed above, following Plaintiff's

---

[6]    As discussed later in this section, the medical records provided by Dr. Fundo were not
probative on the issue.

27

discharge from Bronx-Lebanon, the evidence of record relating to his heart conditions in general, and his diagnosis of coronary artery disease in particular, is both scant and devoid of any materials from Plaintiff's cardiologist, Dr. Khullar. *Sanchez*, 2015 WL 736102, at *6 (finding remand to obtain opinions from treating physicians proper where medical records before ALJ were not voluminous). In addition, the record contains contradictory opinions concerning Plaintiff's ability to work — with Dr. Lee concluding that Plaintiff was potentially unable to work based on his coronary artery disease and Dr. Revan finding no such limitation. (SSA Rec. 377, 387). This ambiguity further counsels in favor of a remand to obtain an RFC opinion from Dr. Khullar. *See Moreira* v. *Colvin*, No. 13 Civ. 4850 (JGK), 2014 WL 4634296, at *7 (S.D.N.Y. Sept. 15, 2014) (remanding to obtain RFC evaluations from treating physicians where record contained inconsistencies); *Santiago* v. *Comm'r of Soc. Sec.*, No. 13 Civ. 3951 (LTS) (SN), 2014 WL 3819304, at *20 (S.D.N.Y. Aug. 4, 2014) (remanding to allow ALJ to obtain opinions from treating physicians where the record contained differing opinions concerning claimant's disability).

While the ALJ received documents containing an RFC analysis from Dr. Fundo, these reports cannot remediate the ALJ's failure to obtain a similar opinion from Dr. Khullar. The record indicates that Dr. Fundo's RFC analysis primarily accounted for Plaintiff's diabetes and congestive heart failure, and included, at best, a perfunctory assessment of his coronary artery disease.

(SSA Rec. 401, 403).[7]  As to Plaintiff's heart ailments, Dr. Fundo completed a

"medical statement regarding *heart failure* for Social Security disability claim."

(*Id.* at 403 (emphasis added)).  This form contained a checklist of symptoms

that tracked the requirements for disability under section 4.02 (chronic heart

failure) of 20 C.F.R. Part 404, Subpart P, Appendix I, but did not include the

elements of a disability claim under section 4.04 (ischemic heart disease).  (*Id.*).

Accordingly, the documents submitted by Dr. Fundo engender additional

ambiguity about Plaintiff's RFC.

In sum, the Court cannot conclude that there was sufficient evidence

from which the ALJ could have assessed Plaintiff's RFC given the sparse

medical evidence concerning Plaintiff's coronary artery disease and the

contradictory conclusions as to how this ailment impacted Plaintiff's RFC.  In

consequence, remand is required to obtain an RFC opinion from Dr. Khullar.[8]

*See Sanchez*, 2015 WL 736102, at *9; *Johnson* v. *Astrue*, 811 F. Supp. 2d 618,

631 (E.D.N.Y. 2011); *Dimitriadis,* 2004 WL 540493, at *11-12.

---

[7]     The only mention of coronary artery disease in Dr. Fundo's RFC analysis appeared on a
form titled "medical statement regarding diabetes," which found that Plaintiff faced a
number of limitations.  (SSA Rec. 401).

[8]     In light of the Court's resolution of this matter, it declines to reach any issues relating
to Plaintiff's late submission of medical evidence in his Amended Complaint.

**CONCLUSION**

For the foregoing reasons, Defendant's motion for judgment on the pleadings is DENIED, and the matter is remanded to the Commissioner for further development of the record.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      October 30, 2015
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

A copy of this Order was mailed by Chambers to:

Jose Rivera
383 East 143 Street, Apt. 12-C
Bronx, NY 10454